

# STATE OF LOUISIANA

# COURT OF APPEAL

# FIRST CIRCUIT

## 2024 CU 0690

JAMAR A. FLOWERS

VERSUS

ADRIENNE D. TASKER

Judgment Rendered: __FEB 2 8 2025__

* * * * * *

On Appeal from the Family Court
In and for the Parish of East Baton Rouge
State of Louisiana
Docket No. 223397

Honorable Ronald D. Cox, Judge *Pro Tempore* Presiding
Honorable Charlene C. Day, Presiding Judge

* * * * * *

Veronica "Vicky" Jones              Counsel for Plaintiff/Appellee
Baton Rouge, Louisiana             Jamar A. Flowers


Jamar A. Flowers                   Plaintiff/Appellee
Zachary, Louisiana                 Pro Se


NaTashia Carter Benoit             Counsel for Defendant/Appellant
Baton Rouge, Louisiana             Adrienne D. Tasker

* * * * * *

**BEFORE: McCLENDON, C.J., LANIER AND BALFOUR, JJ.**

**McCLENDON, C.J.**

In this child custody case, the mother appeals a judgment that granted sole custody to the father, suspended the mother's supervised visitation until approved by the minor child's medical providers, continued a previously-issued protective order against the mother for an additional eighteen months, and ordered the mother to pay child support. The mother also appeals the judgment denying her motion for new trial. We vacate in part, affirm in part, and remand.

### FACTS AND PROCEDURAL HISTORY

Jamar A. Flowers and Adrienne D. Tasker are the parents of J.T.T., born on July 2, 2013. The parties did not have a formal custody agreement until Flowers instituted this litigation by filing a petition to establish paternity, custody, and visitation on October 14, 2020. Subsequently, the parties stipulated that Flowers is J.T.T.'s biological father, agreed to a week-to-week physical custody schedule, and agreed to abide by certain co-parenting guidelines. The trial court signed the interim stipulated judgment on November 20, 2020. Extensive and contentious litigation followed.

On December 7, 2020, Flowers filed a petition seeking immediate temporary custody and a rule for contempt. Flowers alleged that Tasker denied his physical custody period beginning on December 5, 2020, because she claimed that J.T.T. was quarantined pursuant to doctor's orders following a Covid-19 exposure; however, Tasker refused to provide corroborative medical documentation. During a December 7, 2020 hearing, the trial court denied Flowers' request for immediate temporary custody and ordered Tasker to advise Flowers of J.T.T.'s Covid-19 test results. Flowers filed a second rule for contempt on December 23, 2020. Therein, Flowers alleged that Tasker submitted falsified documents to the trial court in support of her claims that J.T.T. was under doctor's orders to quarantine during the December 7, 2020 hearing. Flowers' rules for contempt were ultimately resolved pursuant to a court-approved stipulated consent judgment on March 3, 2021. Said judgment found Tasker in contempt of court for denying Flowers' physical custody period beginning on December 5, 2020, and for submitting falsified medical documents to the trial court.

2

Following a January 12, 2021 hearing, the parties stipulated to a "2-2-5" physical custody schedule. The stipulation further prohibited "excessive corporal punishment by either party or a third party[.]"

However, on March 5, 2021, Flowers, on his own behalf and on behalf of J.T.T, filed a petition for protection from abuse against Tasker pursuant to the Domestic Abuse Assistance Statutes, LSA-R.S. 46:2131, *et seq.* (Flowers' petition for protection). Flowers alleged that on or about February 12, 2021, his wife, Krystal Flowers, and her co-worker, Orlean Wilkinson,[1] noticed marks on J.T.T.'s face. According to Flowers, when the women asked J.T.T. what happened, he disclosed that Tasker slapped him and hit him in the head with a belt buckle. Flowers further alleged he had reported the abuse to law enforcement and to the Department of Children and Family Services (DCFS). The trial court issued a Temporary Restraining Order (TRO) and granted Flowers temporary custody of J.T.T.[2] Although the TRO was initially in effect through March 24, 2021, it was repeatedly extended and remained in effect until the parties resolved Flowers' petition for protection pursuant to a court-approved stipulated consent judgment on July 21, 2021.

On April 16, 2021, the parties stipulated to Tasker having supervised visitation with J.T.T. Tasker's sister, Claudia Tasker, agreed to serve as the supervisor. The trial court signed a written judgment confirming the stipulation the same day.

On May 7, 2021, Tasker filed a petition for protection from abuse against Krystal (Tasker's petition for protection against Krystal), pursuant to LSA-R.S. 46:2131, *et seq.* The trial court issued the requested TRO. On May 26, 2021, Krystal filed a peremptory exception pleading the objection of no cause of action, arguing that Tasker lacked standing under LSA-R.S. 46:2133(D) to file the petition. The trial court ultimately

---

[1] The record contains various spellings of Ms. Wilkinson's name. We use Orlean Wilkinson throughout for consistency.

[2] Louisiana law mandates that trial courts use a uniform form for the issuance of any TRO or protective order, called the "Uniform Abuse Prevention Order." See LSA-R.S. 46:2136.2(C); **Head v. Robichaux**, 2018-0366 (La.App 1 Cir. 11/2/18), 265 So.3d 813, 816. The trial court checks off one of the following boxes provided on the uniform form to indicate under which law it issues the TRO and/or protective order: (1) LSA-R.S. 46:2131, *et seq.* (Domestic Abuse); (2) LSA-R.S. 46:2151 (Dating Violence); (3) LSA-R.S. 46:2171, *et seq.* (Non-intimate stalking); (4) LSA-R.S. 2181, *et seq.* (Non-intimate sexual assault); (5) LSA-Ch.C. art. 1564, *et seq.* (Children's Code Domestic Abuse); or, (6) a court approved consent agreement. **Head**, 265 So.3d at 816-17.

3

dismissed Tasker's petition for protection against Krystal because it was transferred to civil court.

Giving rise to the instant appeal, on May 26, 2021, Flowers filed a petition seeking permanent sole custody of J.T.T. and other relief, including child support (petition for permanent sole custody). Therein, Flowers alleged that DCFS had completed an investigation into the allegations of abuse by Tasker and found "that the reported abuse was justified/valid." Accordingly, Flowers requested permanent sole custody of J.T.T. Alternatively, Flowers requested that the trial court designate him as domiciliary parent and maintain Tasker's supervised visitation. Flowers additionally requested that the trial court order Tasker to pay child support and provide him with a copy of J.T.T.'s insurance cards; prohibit discussion of the legal proceedings with J.T.T. or in his presence; permit Flowers to claim J.T.T. for tax purposes; and issue a TRO enjoining Tasker from "harming, harassing, or bothering [Flowers] in any way, including going to his place of residence or employment without his consent." The matter was set for hearing on June 21, 2021.

On June 14, 2021, Tasker filed a petition for protection from abuse on her own behalf and on behalf of J.T.T. against Flowers pursuant to LSA-R.S. 46:2131, *et seq.* (Tasker's petition for protection against Flowers). The trial court issued a TRO on June 14, 2021 as requested, but specified that custody would continue as previously set.

The following day, on June 15, 2021, Flowers filed a petition seeking an *ex parte* interim order of sole custody. Therein, Flowers alleged he had learned that J.T.T. was being left alone with Tasker in violation of the April 16, 2021 stipulated judgment requiring supervised visitation. Flowers further alleged that on or about May 31, 2021, J.T.T. reported that his thirteen-year-old half brother, B.W., had sexually abused him while unsupervised at Tasker's home. Flowers alleged that he relayed J.T.T.'s disclosure to Tasker's sister Claudia, and Claudia relayed the disclosure to Tasker, who punished J.T.T. and instructed him to recant. When J.T.T. refused to recant, Tasker struck him with a belt and forced him to kneel for a long period of time. Flowers also asserted that DCFS and law enforcement were investigating these additional allegations of abuse. Flowers requested that during the pendency of the investigations, the trial court issue an interim order of sole custody, terminate Tasker's supervised visitation, remove Claudia as

4

the visitation supervisor, and issue a finding of contempt against Tasker. Following a June 15, 2021 hearing, the trial court granted Flowers interim sole custody, suspended Tasker's visitation until June 21, 2021, and set the matter for hearing on June 21, 2021.

On June 21, 2021, Flowers' petition for protection against Tasker came for trial. The trial court heard evidence from Flowers, Krystal, and Orlean Wilkinson, before continuing the trial of the petition for protection, as well as the TRO and all other outstanding matters, to June 21, 2021.

The second day of trial of Flowers' petition for protection against Tasker resumed on July 21, 2021. The parties resolved the matter pursuant to a court-approved consent judgment, which issued a six-month protective order against Tasker in favor of J.T.T. and Flowers, in effect until January 21, 2022; granted Flowers temporary custody of J.T.T.; granted Tasker two hours of supervised visitation each week; and ordered Tasker to complete a twenty-six-week domestic abuse intervention program through Baton Rouge City Court, after which she could request that the trial court remove the supervision requirement. The petition for permanent sole custody, which had been set for trial on October 1, 2021, was re-set for January 21 and January 24, 2022.[3]

The petition for permanent sole custody came for trial on January 21, 2022. At that time, J.T.T. was eight years old.

The trial court heard testimony from Flowers, his wife Krystal, and Tasker.[4] Flowers and Krystal testified that J.T.T. disclosed multiple instances in which Tasker physically abused him. Flowers testified that Tasker hit J.T.T. in the head with a belt buckle, leading Flowers to file his March 5, 2021 petition for protection. Flowers further testified that when J.T.T. was removed from Tasker's custody on the basis of the petition for protection, J.T.T. disclosed that Tasker had whipped him with an extension cord and revealed marks on his arm. According to Flowers and Krystal, DCFS found J.T.T.'s allegation regarding being struck with the belt buckle "valid[.]"Tasker disputed this testimony, claiming that DCFS had found the allegations "invalid[.]"

---

[3] We note that the July 21, 2021 minutes state the new trial dates were set in January of 2021, rather than 2022. However, this was plainly a typographical error.

[4] Neither Flowers nor Tasker objected to the other's testimony regarding out-of-court statements made by J.T.T., and Tasker does not raise this issue on appeal.

Regarding the allegations of sexual abuse, Flowers testified that J.T.T. ultimately disclosed that he had been raped by three different males while left unsupervised in Tasker's custody. According to Flowers, around Memorial Day of 2021, J.T.T. told him that B.T., Tasker's oldest son and J.T.T.'s half brother, taught J.T.T. "how to watch porn[,]" which "led to . . . [B.T.] playing with [J.T.T.'s] private areas" when Tasker left the boys unsupervised. According to Flowers, he reported the allegations to DCFS and law enforcement, and B.T. was interviewed, but the investigation did not proceed further. Flowers also testified that when he told Claudia about J.T.T.'s allegations, she shared them with Tasker, who pressured J.T.T. to recant and forced him to kneel for "hours" when he refused. At the time of trial, B.T. was thirteen years old and still lived with Tasker. Later, J.T.T. disclosed that he was also sexually abused by Tasker's cousin, D.T., whom Tasker identified as being thirteen years old at the time of trial, and "Big A[,]" who Tasker identified as Albert York, a man who helped Tasker move. Flowers and Krystal also testified that J.T.T. had attempted to report the sexual abuse to Tasker, but she told him to "get the 'F' out of her room."

Flowers testified that J.T.T. had an established relationship with a counselor named Myeisha Spears, who he began seeing in "September or November," and whom he saw twice a month. Flowers stated he had seen progress in J.T.T., but "the regress came when he did what he did at school." Regarding the incident at school, Krystal testified that on December 15, 2021, another student reported that he and J.T.T. had gone to the bathroom, and J.T.T. "had him against the wall . . . was trying to tickle him on the stomach and then below the waist and would not let him off the wall." The student felt uncomfortable and went to the office crying. Krystal clarified that the contact was described to her as "below the waist in a sexual way[.]"When Krystal and Flowers spoke to J.T.T. later that day, he "admitted" to the other child's report. Krystal testified that she "explained to [J.T.T.] that children don't do things like that and a lot of times when that happens, that means someone - - you know there - - they have done that to you." Flowers then gave J.T.T. a book and told him to write down what had happened to him. After reading J.T.T.'s account, Krystal suggested that J.T.T. see a psychiatrist. Krystal further testified that because the school was aware of J.T.T.'s prior allegations of physical and

6

sexual abuse, J.T.T. was not suspended, "because they understood that he was possibly going through something."

Subsequently, Krystal took J.T.T. to see Dr. Carol Smothers, a pediatrician. Krystal testified that J.T.T. told Dr. Smothers "all of the things that he had written down[.]" According to Krystal, Dr. Smothers did not see evidence of abuse during her physical examination of J.T.T., though she explained that was common if the abuse was not recent. However, when Dr. Smothers received J.T.T.'s bloodwork, she called Flowers and told him to bring J.T.T. back for urinalysis. When the urinalysis results came in, Dr. Smothers called Flowers and told him to bring J.T.T. to the Our Lady of the Lake Children's Hospital emergency room to be further evaluated. After the emergency room visit, a S.A.F.E. clinic visit was set. Krystal explained the "safe clinic" was for individuals who were sexually abused, though she was not sure if it was just for children.

Flowers testified that J.T.T. began seeing a psychiatrist the day before trial. The morning of trial, Flowers and Krystal brought J.T.T. to the safe clinic visit, then left him with his godmother so they could attend trial.

Flowers offered Exhibit 2, which he identified as a report containing the allegations of abuse as conveyed by J.T.T. to a social worker. The trial court admitted Exhibit 2 into evidence. Upon review, Exhibit 2 appears to be a printout of an initial written report made to DCFS through a DCFS Online Reporter Portal, dated January 6, 2022 (Exhibit 2). Exhibit 2 reflects that Ashlyn Hindrichs, a "Pediatric ER Social Worker" employed by Our Lady of the Lake Children's Hospital (OLOL Children's Hospital), reported that J.T.T. was evaluated at OLOL Children's Hospital. Exhibit 2 documented that Flowers reported that J.T.T. had been "sexually assaulted by 3 different males[,]" all of whom "have raped him anally." The report further stated, "[J.T.T.] had a physical exam performed on him by Dr. Saucier. It was found he did show scarring to his anus." Tasker did not object to the admission of Exhibit 2.

Flowers testified that it was previously difficult for him to build a relationship with J.T.T. because Tasker "want[ed] to dominate" his interactions with J.T.T. He testified that after he saw J.T.T., Tasker would "snatch him" for months. Flowers also testified that J.T.T. had missed nineteen days of school and had seventeen "tardies" when he lived

7

with Tasker. In contrast, Flowers testified that since J.T.T. had been in his care, he was "into sports[,]" played video games, attended school regularly, and was a "straight A" student. Flowers stated, "But the biggest thing is he [is] happy." Krystal testified that her relationship with J.T.T. was "great" and "he's like one of my other children."

Flowers asked that the trial court suspend all physical and telephone contact between J.T.T. and Tasker until medical professionals advised otherwise. Flowers testified that J.T.T. had not communicated a desire to speak to Tasker. Krystal testified that "after every visit [Tasker] has with J.T.T., there's an allegation . . . CPS has been to not only our home, but they have gone to [J.T.T.'s] school" on numerous occasions. Krystal clarified that she believed Tasker was trying to coach J.T.T., and it made him "sad[.]" Krystal testified that she felt Tasker was a danger to J.T.T. and did not think he should have contact with her.

Tasker admitted to whipping her children with a belt and cursing at them. However, she denied whipping her children with a belt buckle or an extension cord. According to Tasker, B.T. hit J.T.T. with the extension cord while the two were fighting, and when she "jerked" the cord from the boys, it "popped back" and hit J.T.T.'s arm and leg.

Flowers also submitted an audio recording as Exhibit 4.[5] Tasker was asked to explain the contents of the recording. She confirmed that the recording captured an altercation she had with B.T., while her two younger children were in the home. The audio recording includes Tasker making numerous statements and threats to J.T.T.'s thirteen-year-old half brother B.T., such as: "you bust my mother fucking baby's lip"; "the longer you walk from me the worse it's gonna be when I get you"; "I take the spray and I spray [your] fucking eyes to blind you"; "wear yo ass out bitch"; "two seconds I'm about to make your mouth bleed"; "get the fuck outta here bitch"; "punk ass bitch"; and "you kicked him because yo gay ass was mad I told you [to get something from the truck.]"

---

[5] We note that Exhibit 4 is a video recording. However, most of the image is obscured, and the transcript reflects that Exhibit 4 was offered for its audio content, as the trial court stated, in pertinent part:

> The two attorneys played it in my chambers, and I couldn't see. I saw one person's face, your face - - or the kid recording you - - but I - - it's not like a video that you could see a video. . . . They want to offer it for the voice.

Thus, we refer to Exhibit 4 as "the audio recording" herein.

In addition to Tasker's voice, the recording captured sounds of repeated slapping, heavy thuds, and Tasker's two younger children crying in the background.

At one point while the audio recording was playing, the trial court interrupted to ask, "So that was you saying you would blind your own child? You called him out his name multiple - - you told him you would bloody his mouth." Tasker responded, "Yes it was."

After the audio recording concluded, Tasker was asked if "that was your thirteen-year-old son [B.T.]?" She replied, "That was my thirteen-year-old son being very rebellious. Yes it was." When asked whether the audio recording depicted the first and only time Tasker acted that way, she replied, "That's the first time I have ever - - ever called my child that many bitches or cut up like that to that extent to calling him a punk." At one point, Tasker stated, "I think that my child was being disrespectful, and he just kept - - kept just fighting me back - - blocking the licks actually. So, he wasn't really getting hit cause he was blocking the licks."

Tasker testified that she "broke" when she learned of J.T.T.'s allegation against her thirteen-year-old son B.T., and she was frustrated with B.T. because he had hit J.T.T. with the extension cord, contributing to her custody problems. Tasker also claimed that Flowers and B.T.'s father were engaged in a "plot" against her in order to avoid paying child support and had been blackmailing her with the audio recording. Tasker testified that she put herself and B.T. in counseling following the events depicted in Exhibit 4. She also testified she does not think she would act that way again, because she is now in counseling and takes medication for her nerves.

Nevertheless, Tasker admitted she had not completed the twenty-six-week program for domestic violence as ordered by the July 21, 2021 protective order. She stated she was unable to afford that program and had instead participated in other programs available through DCFS.

Regarding the allegations of sexual abuse, Tasker testified that J.T.T. had never told her he had been sexually abused, and that she did not believe he had been sexually abused. Tasker stated, "I believe J.T.T. is being coached and coerced." When asked if she had seen the report that indicates that J.T.T. "has anal trauma[,]" Tasker responded,

9

"Yes. I'm a medical assistant. I graduated 2015. [J.T.T.] had, they won't know because they wasn't active in [J.T.T.'s] life - - but [J.T.T.] suffers from hemorrhoids, and on top of that, they have never asked me if [J.T.T.] can eat hot stuff." When asked if she was suggesting that the trauma was caused by hemorrhoids or hot food, Tasker answered negatively, saying, "I'm not suggesting anything. I'm just pointing it out. Because they don't know [J.T.T.]"

Tasker also argued that the initial investigation did not reveal any physical evidence, and therefore, any subsequent finding of trauma must be from something that happened while J.T.T. was in Flowers' custody. Tasker testified that she does not believe J.T.T. is safe with Flowers and Krystal. She claimed J.T.T. told her Flowers and Krystal made him "run laps until he said that his brother [B.T.] touched him." Tasker further explicitly testified she did not believe B.T. assaulted J.T.T., did not believe D.T. assaulted J.T.T., and did not believe Albert York assaulted J.T.T. and B.T. When asked how she could help J.T.T. if she does not believe him, Tasker stated that she would bring him to the doctor.

Following trial, the trial court rendered judgment as follows:

> The court is going to continue the sole custody with Jamar Flowers of [J.T.T.] I'm glad that he's seeing a counselor and psychiatrist, and the court would like for there to be visitation with his mother, but not until that would be approved by those medical experts the child is right now seeing. I guess saw today.

> So, there will be no supervised visitations until it's been okayed by the medical experts and the psychological experts.

> The court sets the child support at $249.00 a month, paid by [Tasker]. Tasker is to pay all costs of supervision, if there are any, in the future, and all costs of this hearing and the court's going to continue the protective order for an additional eighteen months.

When asked to further clarify the ruling, the trial court specified that child support was to be paid retroactive to the date of filing; ordered Tasker to pay attorneys fees in the amount of $1,000.00; set a court cost review for April 4, 2022; set a compliance review for April 5, 2022; and cast Tasker with all costs of the proceedings. The trial court signed a written judgment consistent with these oral rulings on February 22, 2022.

On February 8, 2022, Tasker filed a motion for new trial and/or motion to dismiss the protective order (motion for new trial). Following an April 5, 2022 hearing, the trial

court denied Tasker's motion for new trial. The trial court signed a written judgment in conformity with its ruling on August 24, 2022.

On appeal, Tasker contends that the trial court: erred in denying her motion for new trial; erred in permitting Flowers to offer inadmissible hearsay testimony and unauthenticated documentary evidence; erred in failing to apply the "best interest" factors in granting Flowers sole custody and denying Tasker visitation; and erred in rendering a child support order in the absence of evidence of the parties' income.[6]

## APPELLATE JURISDICTION

Appellate courts have a duty to examine subject matter jurisdiction *sua sponte*, even when the parties do not raise the issue. **Hill International, Inc. v. JTS Realty Corporation**, 2021-0157 (La.App. 1 Cir. 12/30/21), 342 So.3d 322, 325. In Tasker's first assignment of error, which challenges the trial court's judgment denying her motion for new trial, she argues that the custody judgment was improperly rendered after a two-day trial before two different judges. Specifically, Tasker claims that the custody trial began on June 21, 2021, before Judge Charlene Charlet Day, and was resumed and completed on January 21, 2022, before Judge Ronald Cox, presiding *ad hoc*.[7]

Having thoroughly reviewed the record in its entirety, it is plain that this assertion is incorrect. Rather, Judge Day presided over the June 21, 2021 and July 21, 2021 trial of Flowers' petition for protective order, and Judge Cox presided over the January 21,

---

[6] The established rule in this circuit is that the denial of a motion for new trial is an interlocutory and non-appealable judgment. However, the court may consider interlocutory judgments as part of an unrestricted appeal from a final judgment. Because Tasker's challenge of the trial court's denial of her motion for new trial is part of the appeal from the final judgment, we may consider the issue on appeal. **Succession of Coon**, 2020-0673 (La.App. 1 Cir. 12/30/20), 318 So.3d 947, 949 n.1, writ denied sub nom. **In re Succession of Coon**, 2021-00126 (La. 3/16/21), 312 So.3d 1101.

[7] Specifically, Tasker asserted that a June 21, 2021 minute entry reference to a "Day 2" of trial establishes that the custody trial began on June 21, 2021, before Judge Day, and was resumed and completed on January 21, 2022, before Judge Cox. However, this conflicts with Tasker's June 9, 2021 pre-trial order. The pre-trial order explicitly referenced Flowers' petition for protection against Tasker, set for trial on June 21, 2021. Further, under the heading of "[contested issues,]" it identified the questions of whether the trial court should issue a protective order in favor of Flowers and J.T.T. and whether the temporary order of sole custody in favor of Flowers should be extended. In addition to Tasker's own pleading reflecting that the June 21, 2021 trial date pertained to Flowers' petition for protection rather than the petition for permanent sole custody, the record contains a written judgment signed on August 4, 2021, which states that the matter before the trial court on June 21, 2021, was a "[TRO] filed by Mr. Jamar A. Flowers[,]" as well as a June 14, 2021 minute entry which states that the "DOMESTIC VIOLENCE" matter was set for trial on June 21, 2021. Thus, it is clear that the "Day 2" note in the June 21, 2021 minute entry referenced the second day of trial of Flowers' petition for protection, to be held July 21, 2021.

11

2022 custody trial and the April 5, 2022 hearing of Tasker's motion for new trial.[8] Nevertheless, Tasker's argument raises an issue we must address with respect to our appellate jurisdiction.

Although Judge Cox issued oral rulings in favor of Flowers at the conclusion of the custody trial and the hearing of the motion for new trial, Judge Day signed the written judgments presently on appeal. Generally, the judge who presided over the case must sign the judgment, and a judgment signed by a judge who did not preside over the hearing does not constitute a final judgment subject to this court's appellate jurisdiction. See LSA-C.C.P. art. 1911; **In re M.L.M.**, 2019-1030 (La.App. 1 Cir. 4/23/20), 300 So.3d 902, 905-906. However, exceptions exist allowing a judge who did not hear a matter to sign a judgment. See LSA-C.C.P. art. 253.3, LSA-C.C.P. art. 194, and LSA-R.S. 13:4209; **In re M.L.M.**, 300 So.3d at 905. In relevant part, LSA-R.S. 13:4209(B)(2) provides, "[i]f a prior judge has stated an affirmative intent to sign a judgment and failed to do so for whatever reason, the successor judge is empowered to sign the judgment." In both **Henry v. Sullivan**, 2016-1867 (La. 11/18/16), 206 So.3d 858 (*per curiam*), and **Donahue v. Donahue**, 2016-1853 (La. 11/18/16), 206 So.3d 858 (*per curiam*), the original trial judge recused herself after issuing oral reasons but before signing the final judgments. The cases were re-allotted to Judge Devereux, who signed the written judgments. The supreme court held that Judge Devereux, "in her capacity as successor judge, [was] empowered to sign the judgment[s]" because the original trial judge, "through her oral reasons, clearly manifested an affirmative intent to sign [the] judgment[s.]" The supreme court reasoned, "Any other result would be contrary to the statutory intent as well as the interests of judicial economy." Additionally, in **Prejean v. McMillan**, 2018-0919 (La.App. 1 Cir. 2/28/19), 274 So.3d 575, 578 n.4, this court found:

> Although the grant of summary judgment was rendered by Judge Dupont, we find that Judge Janice Clark's signing of the judgment in conformity with Judge Dupont's ruling was within the ambit of the Louisiana Supreme Court's November 14, 2017 order assigning Judge Dupont to sit *pro tempore* for Judge Clark.

---

[8] Once properly appointed, an *ad hoc* or *pro tempore* judge is vested with the same powers and authority as the elected judges of the same court. **Englade v. Louisiana Department of Corrections**, 2021-0132 (La.App. 1 Cir. 12/30/21), 340 So.3d 952, 956, writ denied, 2022-00209 (La. 4/12/22), 336 So.3d 82.

In this matter, the transcript plainly reflects Judge Cox's oral rulings in favor of Flowers regarding both the custody judgment and the judgment denying the motion for new trial. Thus, because Judge Cox indicated his intent to sign the judgments in favor of Flowers, Judge Day, in her capacity as successor judge, was empowered to sign the judgments in conformity with Judge Cox's rulings. See **Cooper v. Theard**, 2021-1574 (La.App. 1 Cir. 8/11/22), 348 So.3d 829, 832 n.1; see also **Prejean**, 274 So.3d at 578 n.4. Accordingly, the February 22, 2022 custody judgment before us on appeal constitutes a valid final judgment over which this court can exercise appellate jurisdiction. See LSA-C.C.P. art. 2083(C); **Donahue**, 206 So.3d at 858-59; **Preston v. Southern University Through Board of Supervisors of Southern University Agricultural & Mechanical College**, 2020-0035 (La.App. 1 Cir. 7/13/21), 328 So.3d 1194, 1197 n.2, writ not considered, 2021-01217 (La. 11/17/21), 327 So.3d 510 n.2.

## LAW AND DISCUSSION

Generally, the court shall award custody to the parents jointly; however, if custody in one parent is shown by clear and convincing evidence to serve the best interest of the child, the court shall award custody to that parent. LSA-C.C. art. 132; **Ehlinger v. Ehlinger**, 2017-1120 (La.App. 1 Cir. 5/29/18), 251 So.3d 418, 422. Every child custody case is to be viewed on its own peculiar set of facts and the relationships involved, with the paramount goal of reaching a decision which is in the best interest of the child. **Ehlinger**, 251 So.3d at 422. The best interest of the child standard is a fact-intensive inquiry, requiring the weighing and balancing of factors favoring or opposing custody in the competing parties on the basis of the evidence presented. **Hains v. Hains**, 2009-1337 (La.App. 1 Cir. 3/10/10), 36 So.3d 289, 300. Because of the trial court's better opportunity to evaluate witnesses, and taking into account the proper allocation of trial and appellate court functions, great deference is accorded to the decision of the trial court. **Hains**, 36 So.3d at 300. Accordingly, the trial court's determination regarding child custody is entitled to great weight and will not be disturbed on appeal absent a clear abuse of discretion. **Harang v. Ponder**, 2009-2182 (La.App. 1 Cir. 3/26/10), 36 So. 3d 954, 960, writ denied, 2010-0926 (La. 5/19/10), 36 So.3d 219.

**Evidentiary Challenges (Second Assignment of Error)**

We first address Tasker's second assignment of error, wherein she argues that the trial court erred in permitting Flowers to offer inadmissible hearsay evidence and unauthenticated documentary evidence at the custody trial. Tasker contends she was unaware of the complained-of evidence prior to the custody trial, and the trial court's erroneous admission of the complained-of evidence resulted in an impermissible expansion of the pleadings and "trial by ambush[.]"

The trial court is granted broad discretion on its evidentiary rulings, and its determinations will not be disturbed on appeal absent a clear abuse of that discretion. **Henry v. Sullivan**, 2016-0564 (La.App. 1 Cir. 7/12/17), 223 So.3d 1263, 1264. The party challenging the trial court's evidentiary ruling bears the burden of proving that the error had a substantial effect on the outcome of the case when compared to the record in its totality. If the error did not prejudice the complaining party, a reversal is not warranted. See **City of Baton Rouge v. Mucciacciaro**, 2021-0656 (La.App. 1 Cir. 5/25/22), 342 So.3d 955, 964, writ denied, 2022-01172 (La. 11/1/22), 349 So.3d 2. However, if a trial court commits an evidentiary error that interdicts its factfinding process, this court must conduct a *de novo* review. Thus, any alleged evidentiary errors must be addressed first on appeal, inasmuch as a finding of error may affect the applicable standard of review. **Marshall v. Marshall**, 2023-0193 (La.App. 1 Cir. 9/28/23), 376 So.3d 891, 894-895.

Tasker argues that the trial court erred in permitting Flowers and Krystal to provide testimonial evidence recounting J.T.T.'s medical treatment for the alleged sexual abuse, because said testimony constituted inadmissible hearsay.[9] Tasker also argues that the trial court erred in admitting two unauthenticated[10] documentary exhibits, namely Exhibit 1, which Flowers identified as a print-out from J.T.T.'s "MyChart" online medical record

---

[9] Hearsay is "a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted." LSA-C.E. art. 801(C). Hearsay is inadmissible "except as otherwise provided by this Code or other legislation." LSA-C.E. art. 802; **Trascher v. Territo**, 2011-2093 (La. 5/8/12), 89 So.3d 357, 364.

[10] Authentication is a process whereby something is shown to be what it purports to be. See LSA-C.E. art. 901. In order for evidence to be admissible at trial, it must either be authenticated as provided in LSA-C.E. art. 901 or be self-authenticating. An exhibit that is not authenticated does not constitute competent evidence. See LSA-C.E. art. 901; **Wolfe Washauer Construction, LLC v. Dart**, 2022-1241 (La.App. 1 Cir. 12/4/23), 383 So.3d 193, 198.

14

portal, and Exhibit 3, which Flowers identified as an after-visit summary issued following one of J.T.T.'s medical appointments. Exhibit 3 also contained a "Diagnosis" of "Sexual assault of child[.]"

Upon review, it does not appear that Flowers' and Krystal's testimonial hearsay regarding their communications with J.T.T.'s medical providers was admissible pursuant to any hearsay exceptions, nor does it appear that Exhibits 1 and 3 were properly authenticated or self-authenticating. However, in the context of child custody cases, where the best interest of the child standard is the fundamental inquiry, the legislature has expressly allowed for relaxed evidentiary rules. See LSA-C.C. art. 131; LSA-C.E. art. 1101(B)(2); see also **C.M.J. v. L.M.C.**, 2014-1119 (La. 10/15/14), 156 So.3d 16, 29. Further, the admission of hearsay testimony or unauthenticated documentary evidence is subject to the harmless error analysis on appeal.

Generally, the admission of evidence that is merely cumulative or corroborative of other evidence is held to be harmless error. See **Clement v. Graves**, 2004-1831 (La.App. 1 Cir. 9/28/05), 924 So.2d 196, 204-205. In her testimony at trial, Tasker conceded both that J.T.T. had made allegations of sexual abuse, and that Tasker had personally seen "the reports from Our Lady of the Lake[,]" presumably referencing Exhibit 2, reflecting that J.T.T. had anal trauma. Consequently, the complained-of evidence was cumulative of Tasker's own testimony acknowledging that J.T.T. had made allegations of sexual abuse and that she was aware of medical findings of anal trauma.[11] Additionally, both Exhibit 1 and 3 were cumulative of Flowers' and Krystal's testimony that they sought medical treatment for J.T.T. following his disclosures of sexual abuse and that J.T.T. was referred for a follow-up with the OLOL Children's Hospital "S.A.F.E. Clinic[,]" which was scheduled to begin at 8:00 a.m. the morning of trial. Considering the cumulative nature of the complained-of evidence, and that the rules of evidence are relaxed in child custody

---

[11] It is well known and documented that sexual abuse of children is extremely difficult to detect because the offense often takes place in secret, the victim is young, vulnerable, and reluctant to testify, and there is often no physical or other evidence the abuse took place. The evidence is rarely direct, but is circumstantial. Moreover, reports of family violence are exceedingly lower than their actual occurrence. **Folse v. Folse**, 98-1976 (La. 6/29/99), 738 So.2d 1040, 1047. In short, it is not uncommon to find an absence of physical evidence in long term sexual abuse of children. See **State v. Mullen**, 2018-0643 (La.App. 1 Cir. 12/21/18), 269 So.3d 772, 785, writ denied, 2020-00408 (La. 10/6/20), 302 So. 3d 529. Thus, physical evidence was not required in order to find that J.T.T. was sexually abused.

cases, we find that any error in the admission of Exhibits 1 and 3 was harmless. See LSA-C.E. art. 1101(B)(2); **C.M.J.**, 156 So.3d at 29; **Clement**, 924 So.2d at 204-205.

Tasker also argues on appeal that the trial court erred by permitting Flowers to offer evidence relevant to events subsequent to the date he filed his petition for permanent sole custody, and thereby improperly enlarging the pleadings and allowing "trial by ambush[.]" However, Tasker failed to raise this specific objection at trial. In order to preserve an evidentiary issue for appellate review, it is essential that the complaining party enter a contemporaneous objection to the evidence or testimony and state the reasons for the objection. **Wilson v. State ex rel. Department of Transportation & Development**, 2011-0007 (La.App. 1 Cir. 8/25/11), 77 So.3d 34, 39, writ denied, 2011-2083 (La. 11/18/11), 75 So.3d 467. Thus, Tasker waived the right to contest this issue on appeal. See LSA-C.E. art. 103. Additionally, even had Tasker raised the objection at trial, this court has consistently declined to find error in the trial court's expansion of the pleadings, even over an objection, to include events subsequent to the date of filing of the motion to modify custody but relevant to the best interest of the child. See LSA-C.C.P. art. 1154; **Morgan v. East Baton Rouge Parish School Board**, 2016-1065 (La.App. 1 Cir. 2/17/17), 215 So.3d 442, 445, writ denied, 2017-0457 (La. 5/1/17), 219 So.3d 330; **Ramirez v. Hite**, 2015-1179 (La.App. 1 Cir. 12/23/15) 2015 WL 9466920, *2 n.3 (unpublished). This argument lacks merit.

## Challenge on the Merits (Third Assignment of Error)

In her third assignment of error, Tasker challenges the trial court's judgment on the merits, arguing that the trial court erred in awarding Flowers sole custody and denying Tasker any visitation and/or access to J.T.T. until approved by J.T.T.'s medical providers. Tasker argues that the record does not support the trial court's judgment and that the trial court failed to apply the best interest of the child factors. We disagree.

16

The paramount consideration in any determination of child custody is the best interest of the child. LSA-C.C. art. 131; **C.M.J.**, 156 So.3d at 28. Louisiana Civil Code article 134 sets forth the factors a court is to consider in determining a child's best interest:

A. Except as provided in Paragraph B of this Article, the court shall consider all relevant factors in determining the best interest of the child, including:

(1) The potential for the child to be abused, as defined by Children's Code Article 603, which shall be the primary consideration.

(2) The love, affection, and other emotional ties between each party and the child.

(3) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.

(4) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.

(5) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.

(6) The permanence, as a family unit, of the existing or proposed custodial home or homes.

(7) The moral fitness of each party, insofar as it affects the welfare of the child.

(8) The history of substance abuse, violence, or criminal activity of any party.

(9) The mental and physical health of each party. Evidence that an abused parent suffers from the effects of past abuse by the other parent shall not be grounds for denying that parent custody.

(10) The home, school, and community history of the child.

(11) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.

(12) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party, except when objectively substantial evidence of specific abusive, reckless, or illegal conduct has caused one party to have reasonable concerns for the child's safety or well-being while in the care of the other party.

(13) The distance between the respective residences of the parties.

(14) The responsibility for the care and rearing of the child previously exercised by each party.

B. In cases involving a history of committing family violence, as defined in R.S. 9:362, or domestic abuse, as defined in R.S. 46:2132, including sexual abuse, as defined in R.S. 14:403, whether or not a party has sought relief under any applicable law, the court shall determine an award of custody or visitation in accordance with R.S. 9:341 and 364. The court may only find a history of committing family violence if the court finds that one incident

17

of family violence has resulted in serious bodily injury or the court finds more than one incident of family violence.

This list of factors provided in LSA-C.C. art. 134 is illustrative, rather than exclusive, and the trial court has discretion to determine the weight to give each factor in light of the totality of the facts and circumstances of the individual case. See LSA-C.C. art. 134, 1993 Revision Comments (b) and (c); **Hodges v. Hodges**, 2015-0585 (La. 11/23/15), 181 So.3d 700, 703.

Every child custody case must be viewed in light of its own particular set of facts and circumstances. Thus, the trial court is in the best position to ascertain the best interest of the child given each unique set of circumstances. Accordingly, a trial court's determination of custody is entitled to great weight and will not be reversed on appeal unless an abuse of discretion is clearly shown. **Tinsley v. Tinsley**, 2016-0891 (La.App. 1 Cir. 1/18/17), 211 So.3d 405, 411.

As set forth in LSA-C.C.P. art. 134(A)(1), the potential for the child to be abused is the primary consideration in determining the best interest of the child. In this regard, Tasker's testimony regarding the audio recording established her verbal abuse of B.T. and, at the very least, raised a serious concern as to her possible physical abuse of B.T. Further, Tasker admitted she had failed to complete the twenty-six-week domestic violence prevention training she was previously ordered to undergo in connection with the protective order; repeatedly stated that she did not believe J.T.T. had been sexually abused; and confirmed that B.T., one of J.T.T.'s alleged abusers, still lived in her home. Additionally, Flowers and Krystal testified that DCFS found J.T.T.'s prior allegation of physical abuse against Tasker to be valid; that J.T.T. had disclosed that numerous instances of sexual abuse occurred when he was left unsupervised in Tasker's care; and that they believed Tasker should not have contact or visitation with J.T.T.

The transcript reflects that, at the conclusion of trial, the trial court expressed a clear concern for J.T.T.'s safety with Tasker. The trial court indicated that J.T.T.'s counselor and psychiatrist should "make [a report] to the court," and stated, in pertinent part, "I'm not going to grant visitation until they say it's safe for [J.T.T.] to be with his mom." In light of the record before us, we do not find that the trial court abused its great

discretion in awarding sole custody to Flowers and suspending Tasker's contact and visitation with J.T.T. until such contact or visitation is approved by his medical providers. This assignment of error lacks merit.

**Child Support Award (Fourth Assignment of Error)**

In her fourth assignment of error, Tasker argues that the trial court erred in rendering a child support order in favor of Flowers "when it received no actual evidence and no actual evidence was introduced at the trial." The determination or modification of child support is governed by the guidelines contained in LSA-R.S. 9:315, *et seq.* As set forth in LSA-R.S. 9:315.1(A), a trial court must consider the Louisiana child support guidelines in *any proceeding* to establish or modify child support. See **Stogner v. Stogner**, 98-3044, (La. 7/7/99), 739 So.2d 762, 767 (emphasis in original). Here, there is no evidence that the trial court considered the child support guidelines or that any documentation was introduced regarding the parties' income or the expenses of the minor child. Accordingly, this assignment of error has merit.

Documentation is essential to the setting of child support. **Drury v. Drury**, 2001-0877 (La.App. 1 Cir. 8/21/02), 835 So.2d 533, 539. Louisiana Revised Statute 9:315.2(A) addresses the appropriate documentation for determining a child support obligation and provides:

> Each party shall provide to the court a verified income statement showing gross income and adjusted gross income, together with documentation of current and past earnings. . . . Suitable documentation of current earnings shall include but not be limited to pay stubs or employer statements. The documentation shall include a copy of the party's most recent federal tax return. A copy of the statement and documentation shall be provided to the other party. When an obligor has an ownership interest in a business, suitable documentation shall include but is not limited to the last three personal and business state and federal income tax returns, including all attachments and all schedules, specifically Schedule K-1 and W-2 forms, 1099 forms, and amendments, the most recent profit and loss statements, balance sheets, financial statements, quarterly sales tax reports, personal and business bank account statements, receipts, and expenses. A copy of all statements and documentation shall be provided to the other party.

Under LSA-R.S. 9:315.2(A), it is each party's duty to introduce accurate and complete evidence of his or her current income. See **Millican v. Wade**, 2023-1050 (La.App. 1 Cir. 2/23/24), 384 So.3d 1011, 1016. When the income of an obligor cannot be sufficiently established, LSA-R.S. 9:315.1.1(B) provides that "evidence of wage and earnings surveys

19

distributed by government agencies for the purpose of attributing income to the obligor is admissible."[12] Pursuant to LSA-R.S. 9:315.1(B)(1), a court is permitted to deviate from the child support guidelines if their application would not be in the best interest of the child or would be inequitable to the parties. In permitting a deviation, the court must provide specific reasons therefor, including a finding of the amount of support that would have been required under the guidelines and the facts and circumstances warranting the deviation. LSA-R.S. 9:315.1(B)(1); **Bell v. Jackson**, 2018-1075 (La.App. 1 Cir. 5/31/19), 278 So.3d 382, 388.

The trial court has great discretion in establishing and modifying child support awards and its judgment will not be disturbed on appeal absent a clear abuse of discretion. **Mize v. Mize**, 2022-0094 (La.App. 1 Cir. 11/4/22), 355 So.3d 16, 19. Where the record lacks adequate information and documentation necessary to make a child support determination, a remand to the trial court is necessary. However, if there is sufficient evidence in the record to render a decision, remand is unnecessary, even if some of the required documentation is lacking. **Millican**, 384 So.3d at 1015. In light of the important policy considerations associated with the setting of child support, an obligor parent should not be allowed to benefit from his own recalcitrance. Thus, when a party fails to introduce accurate and complete evidence of his or her current income, a court may nonetheless find that the record contains sufficient evidence with which to calculate the child support obligation.[13] See **Millican**, 384 So.3d at 1016.

---

[12] Pursuant to LSA-R.S. 13:3712.1, whenever a copy of a self-authenticating report from the Louisiana Workforce Commission, or from any state or federal reporting agency, is offered in evidence in any child or spousal support proceeding, it shall be received by the court as *prima facie* proof of its contents.

[13] In **Millican**, 384 So.3d at 1016, this court noted, "For over a year, [the father] repeatedly ignored the trial court's orders to produce evidence of his current income and now seeks to use his contemptuous behavior in his favor to reverse the trial court's child support order." Continuing, this court concluded that the father's income was "conclusively established" by the mother's introduction of the father's unanswered requests for admissions. See **Millican**, 384 So.3d at 1016-1017.

Similarly, in **St. Philip v. Montalbano**, 2016-0254 (La.App. 1 Cir. 10/31/16), 206 So.3d 909, 913, writ denied, 2016-2110 (La. 1/13/17), 215 So.3d 255, though the parties did not introduce verified income statements, the mother introduced financial documentation for both parties dating back three years. Specifically, the mother offered her last three federal income tax returns, along with her testimony, as well as the father's most recent personal tax return, W2 Wage and Tax Statements for the two preceding years, several corporate tax returns for an entity owned by the father, and several years of monthly statements for bank accounts and a brokerage account for the father. This court found the there was sufficient documentary evidence to support the trial court's determination of the respective incomes of the parties. **St. Philip**, 206 So.3d at 913.

In contrast, in **Bell v. Jackson**, 2018-1075 (La.App. 1 Cir. 5/31/19), 278 So.3d 382, 388, this court found it was unable to determine the propriety of the trial court's ruling based on the record. The record did not contain the father's verified income statement, but rather various bank statements, copies

We note that the order that originally set Flowers' petition for sole custody for hearing on June 21, 2021, included a provision directing Tasker to produce her last two years of tax returns, her last six payroll checks, and all other documentation necessary to determine her income. Here, however, neither party produced verified income statements, or any other documentation of their income, at the January 21, 2022 trial. Rather, the only evidence adduced at trial relevant to the determination of child support was the testimony of the parties. The parties both testified that a prior child support order directed Flowers to pay child support to Tasker. Flowers testified the prior child support order was suspended after he obtained sole custody of J.T.T. The transcript reflects the following colloquy:

| | |
|---|---|
| Flowers' counsel: | [You are] asking the court to set the, what, at the time that your child support was set, were y'all in the same financial circumstances that you are now? Meaning you're not working. She's not working, and child support was set using y'all's imputed income? |
| Flowers: | Yes, ma'am. |
| Flowers' counsel: | Okay, and so you're asking the court to issue an order ordering her to pay the same amount that you were paying? |
| Flowers: | Yes, ma'am. |
| Flowers' counsel: | And what is that amount? |
| Flowers: | I think like $249 or something like that. But I pay $300 a month just to - - just to keep up with it. Stay on time. |
| Flowers' counsel: | Okay, but you're asking the court to set the child support in the amount of $249 - - |
| Flowers: | Yes, ma'am. |
| Flowers' counsel: | Per month? |
| Flowers: | Yes, ma'am. |

Thus, the only evidence that the trial court could have relied on in reaching its child support order was Flowers' testimony that the previous child support order directed him to pay approximately $249.00 per month to Tasker, and that the parties had not experienced a change in circumstances because both remained unemployed. In this

---

of checks and cash withdrawal receipts from the father's business, and "an *in globo* exhibit containing various documents[.]" This court summarized, "the indiscernible evidence as to [the father's] past earnings. . . . render[ed] the determination of his actual earnings virtually impossible on the record as presently constituted."

matter, a review of the propriety of the trial court's order is virtually impossible on the record as presently constituted. See **Bell**, 278 So.3d at 388. Due to the insufficiency of the evidence, we must vacate the trial court's order and remand the matter to the trial court for a determination of child support in accordance with LSA-R.S. 9:315, *et seq.*

**The Motion for New Trial (First Assignment of Error)**

In Tasker's first assignment of error, she contends that the trial court erred in denying the motion for new trial and refusing to dismiss the protective order. A new trial shall be granted, upon contradictory motion of any party, in the following cases: (1) When the verdict or judgment appears clearly contrary to the law and the evidence; (2) When the party has discovered, since the trial, evidence important to the cause, which he could not, with due diligence, have obtained before or during the trial; or (3) When the jury was bribed or has behaved improperly so that impartial justice has not been done.[14] LSA-C.C.P. art. 1972. A new trial may be granted in any case if there is good ground therefor, except as otherwise provided by law. LSA-C.C.P. art. 1973. On a motion for new trial, it is the mover's burden to prove to the trial court that she is entitled to a new trial for one of the grounds listed in the Code of Civil Procedure. The standard of review of a denial of a motion for new trial, whether based on peremptory or discretionary grounds, is that of abuse of discretion. **Jackson v. Wise**, 2017-1062 (La.App. 1 Cir. 4/13/18), 249 So.3d 845, 856, writ denied, 2018-0785 (La. 9/21/18), 252 So.3d 914.

On appeal, Tasker argues that she was entitled to a new trial based on newly discovered evidence pursuant to LSA-C.C.P. art. 1972(2). To prevail on a motion for new trial on the basis of newly discovered evidence, a party is required to show that the evidence in question: (1) was not merely cumulative; (2) would tend to change the result of the case; (3) was discovered after trial; and (4) could not, with due diligence, have been obtained before or during trial. See **Slaughter v. Board of Supervisors of Southern University & Agricultural & Mechanical College**, 2010-1049 (La.App. 1 Cir. 8/2/11), 76 So.3d 438, 460, writ denied, 2011-2110 (La. 1/13/12), 77 So.3d 970. In

---

[14] Louisiana Code of Civil Procedure article 1972(3) is inapplicable to this case. Therefore, we do not consider it herein.

22

addition, LSA-C.C.P. art. 1975 requires that the allegations of fact set forth in a motion for new trial based on LSA-C.C.P. art. 1972(2) be "verified by the affidavit of the applicant."

In this matter, Tasker claims that prior to the custody trial, she "was never made aware that [J.T.T.] had received any treatment or care for any alleged sexual abuse nor was she aware that [J.T.T.] was seeing any medical professionals relating to same[.]" Therefore, Tasker contends she was unable to acquire J.T.T.'s medical or counseling records prior to trial. She also claims that when she acquired the relevant records after trial, she discovered that the records were "blatantly false and/or contrary" to "the allegations testified to and evidence submitted[.]" Tasker claims that, had she been able to present this evidence at trial, it "would have clearly and unequivocally show[n] that [J.T.T.] had sustained no sexual abuse/assault as was falsely testified to" by Flowers and Krystal. However, Tasker did not verify the allegations in her motion for new trial with an affidavit as required by LSA-C.C.P. art. 1975,[15] nor did she offer the newly alleged evidence in support of her motion for new trial. Thus, Tasker's motion for new trial pursuant to LSA-C.C.P. art. 1972(2) and her brief on appeal contain only unsubstantiated arguments. Accordingly, the trial court did not abuse its great discretion in denying the motion for new trial pursuant to LSA-C.C.P. art. 1972(2). See **Freneaux v. Shelton**, 2016-0694 (La.App. 1 Cir. 7/19/17), 2017 WL 3083662, *10 (unpublished), writ denied, 2017-1433 (La. 11/6/17), 229 So.3d 471.

Tasker further contends that she was entitled to a new trial pursuant to LSA-C.C.P. art. 1972(1), because the judgment was clearly contrary to the law and the evidence, or pursuant to LSA-C.C.P. art. 1973, because there is good ground therefor. Having thoroughly reviewed the record in its entirety and concluded that it adequately supports the trial court's judgment on the issues of custody and visitation, we do not find that the judgment was contrary to the law and evidence, nor do we find good ground for a new

_____

[15] See **Charpentier v. Louisiana Land & Exploration Co.**, 415 So.2d 452, 455 (La.App. 1 Cir. 1982) ("It has been held a trial court acts correctly when it refuses to grant a new trial because of the failure to include the verifying affidavit").

trial. Accordingly, the trial court did not abuse its great discretion in denying Tasker's motion for new trial pursuant to LSA-C.C.P. arts. 1972(1) and 1973.[16]

Finally, Tasker argues the trial court erred in denying her motion for new trial as to the eighteen-month continuation of the protective order, because the protective order was not before the trial court on January 21, 2022. However, the judgment continuing the protective order was rendered on January 21, 2022 and signed on February 22, 2022; thus, it expired more than a year before the instant appeal was lodged with this court on July 30, 2024. This court has dismissed direct appeals of protective orders for lack of jurisdiction when the protective orders expired while the appeal was pending, reasoning that the issues were moot because a judgment or decree could serve no useful purpose and give no practical relief or effect.[17] **Garside v. Laird**, 2021-0512 (La.App. 1 Cir. 12/22/21), 340 So.3d 13, 17, citing **Watson v. Banguel**, 2020-0799 (La.App. 1 Cir. 9/30/21), 2021 WL 4465839, *2 (unpublished); **McKee v. McKee**, 2020-1314 (La.App. 1 Cir. 6/16/21), 2021 WL 2451440, *2 (unpublished), writ denied, 2021-00984 (La. 11/3/21), 326 So.3d 879. Thus, after a protective order expires, a decision reversing, setting aside, or modifying the order can have no practical relief or effect. **Garside**, 340 So.3d at 17. Consequently, Tasker's arguments challenging the judgment continuing the protective order and the judgment denying the motion for new trial are moot. See **Garside**, 340 So.3d at 17, citing **Pontchartrain Natural Gas System v. Texas Brine Co., LLC**, 2018-0001 (La.App. 1 Cir. 6/4/18), 253 So.3d 156, writ denied, 2018-1124 (La. 9/28/18), 253 So.3d 147.

## CONCLUSION

For the foregoing reasons, we vacate the portion of the February 22, 2022 judgment ordering Adrienne Tasker to pay $249.00 per month in child support. In all other respects, the February 22, 2022 and August 24, 2022 judgments are affirmed. This

---

[16] Concerning the evidentiary issues as they relate to Tasker's motion for new trial, we have already addressed the merits of these arguments above, and need not do so again.

[17] It is well settled that courts will not decide abstract, hypothetical, or moot controversies, or render advisory opinions with respect to such controversies. An issue is moot when a judgment or decree on that issue has been deprived of practical significance or made abstract or purely academic; a case is moot when a rendered judgment or decree can serve no useful purpose and give no practical relief or effect. **Garside v. Laird**, 2021-0512 (La.App. 1 Cir. 12/22/21), 340 So.3d 13, 16. If the case is moot, there is no subject matter on which the judgment of the court can operate. **Garside**, 340 So.3d at 16-17.

24

matter is remanded to the trial court to determine the parties' income, set child support, and to determine any arrearages owed for child support retroactive to the date of judicial demand. Costs of this appeal are assessed to Adrienne Tasker.

**VACATED IN PART, AFFIRMED IN PART, AND REMANDED WITH INSTRUCTIONS.**